

# In the Missouri Court of Appeals
## Eastern District
### DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101553 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Hon. Jimmie M. Edwards |
| TIMOTHY L. BOYKINS, | ) | |
| | ) | Filed: |
| Appellant. | ) | September 8, 2015 |

Timothy Boykins appeals from the judgment entered after a jury found him guilty of murder in the first degree and armed criminal action for the shooting death of Nathan Reed. On appeal, he claims the trial court erred by allowing testimony regarding anonymous tips identifying Boykins as the shooter. We affirm.

The sufficiency of the evidence is not challenged on appeal. Viewed favorably to the verdict, the evidence relevant to the issues on appeal was as follows. Dante Jones testified at trial that he and Reed went to play dice at a friend's house on the corner of Margaretta and Red Bud in the City of St. Louis one evening in November of 2012. The dice game was in the garage—the overhead door (for cars) faced Red Bud and was open the whole time, and the entry doorway (for people) faced the yard and had no door on it at the time. Numerous people entered and left the garage throughout the game. At some point, Reed left with another friend to go to the store. Shortly thereafter, Jones heard the sound of a gunshot coming from outside the garage. Everybody in the garage started to scatter, and Jones—who uses a wheelchair, but was sitting on a crate at the time—was the last person left inside the garage. He had been dragged off the crate in the melee and was lying on the floor near the entry doorway. From there, Jones saw Boykins

chasing Reed from the street through the open overhead doorway, through the garage and out the entry doorway into the yard. Boykins had a black gun in his hand. Jones knew Boykins from the neighborhood, where they had both grown up their whole lives; they saw each other every day and had no problems between them. Boykins also went by the nickname Y.G..

Jones got himself back onto the crate and was scooting towards his wheelchair, when he heard Reed say "Please Homey Y.G., don't kill me; please don't shoot me no more; please don't kill me." Then Jones heard eight or nine more shots coming from the yard and saw Boykins shoot Reed. He admitted he could see them only from the waist up through a garage window and that it was dark outside; but Jones said he saw the shooter's face clearly and was certain it was Boykins. Then Boykins ran back through the entry doorway into the garage and past Jones, and said "D.J., you didn't see shit" and then ran out the overheard doorway towards Red Bud street. Jones testified at trial that he had also seen Boykins and Reed in another argument and altercation a few weeks before, but it was only some wrestling and tussling.

Corey Williams, another friend of Reed's and Jones's, also testified at trial. Williams was at his house on the same block of Margaretta that night; it was two houses from the corner of Red Bud and across the street from where his friends were playing dice. When he heard gunshots and looked out his front windows, Williams could not see what was going on. So he went outside using the back door because his front door was boarded up at the time. He planned to go around to the front where the gunshot sounds came from, but while in his backyard, he saw a person that he recognized from the neighborhood as Y.G. running down the alley from the direction of Red Bud. Williams was looking through his empty garage and said he had a clear view of the alley through the open entry door and the open overheard door that faced the alley. He saw Y.G. wrapping a pistol up in a dark colored hoodie, which Y.G. then carried like a football and ran off across a lot away from the direction of Margaretta and Red Bud.

2

Detective Steven Kaiser was the lead investigating officer who responded to the shooting that night. He testified that after reviewing the scene, the investigation was focused on Timothy Boykins. When asked why, Detective Kaiser explained that he learned that night that an anonymous 911 caller had identified the shooter as Y.G. and had given a physical description, which the detective repeated at trial. The defense objected to this testimony, referencing its pretrial motion to suppress this and other out-of-court statements by anonymous tipsters on hearsay grounds. When asked if he "received additional information that helped them progress in their investigation that evening," Detective Kaiser testified that he learned that another anonymous caller had identified the shooter as Timothy and had given other identifying information. He was then asked if he received "any other tips that helped you focus your investigation on Timothy Boykins?" to which the detective responded that, the day after the incident, he learned of another anonymous tipster who had referred to the shooter as Timothy Boykins. The day after that, Detective Kaiser testified, he learned of a fourth anonymous tipster who had identified Timothy Boykins or Y.G. as the shooter. The prosecutor did not ask what particular steps the officers took in response to any of these anonymous tips.

Detective Kaiser was then asked about witnesses he talked to at the scene. He said that he spoke to Jones that evening, who claimed not to have been in a position to see anything, and no one else came forward that night either. But two days after the incident, Williams called in to the police station. Detective Kaiser called him back, and Williams told the detective that he had seen Boykins wrapping up a gun and running from the direction of the shooting. That same day, Detective Kaiser also talked to Jones again because he saw on a surveillance video that Jones had not been where he claimed to have been the night of the shooting. Jones explained to Detective Kaiser that he had not wanted to talk the night of the crime because he was on probation and worried he would get in trouble for having smoked marijuana that night. Jones then told the detective that he had seen Boykins shoot Reed. Williams and Jones also both identified Boykins

3

from photo arrays.  At the conclusion of his testimony, Detective Kaiser agreed that it was Jones's and Williams's identifications and "the rest of the investigation" that led to taking Boykins into custody.

The jury deliberated for a few hours and could not reach a unanimous decision, but the court instructed them to continue deliberating.  Shortly thereafter, the jury asked for a transcript of Jones's testimony, but the court instructed them to be guided by the evidence as they remembered it.  About thirty minutes later, the jury reached a verdict of guilty on the charges of murder in the first degree and armed criminal action.  Boykins was sentenced as a persistent offender to life without parole on the murder count and life on the armed criminal action count. This appeal follows.

On appeal, Boykins contends that the detective's testimony regarding anonymous tips identifying Boykins as the shooter should have been excluded as hearsay.  He argues that the statements were not offered to show Detective Kaiser's subsequent conduct, but for the truth of the matter asserted—that Boykins was the shooter.  We review this claim for a clear abuse of the trial court's broad discretion to admit or exclude evidence at trial.  State v. Taylor, 373 S.W.3d 513, 520 (Mo. App. E.D. 2012).

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Statements that are not offered for the truth of the matter asserted—but rather to explain subsequent actions of the police—are not hearsay.  Id.  "It is well established that such testimony is admissible to explain the officers' conduct, supplying relevant background and continuity to the action."  State v. Brooks, 618 S.W.2d 22, 25 (Mo. banc 1981).  If a statement is not offered to prove the truth of the matter asserted, then the defendant's right to confront the witnesses against him is not implicated.  Taylor, 373 S.W.3d at 520-21.

But the use of out-of-court statements to explain subsequent police conduct is susceptible to abuse.  If detectives are allowed to narrate the course of an investigation in a way that

4

unnecessarily puts damning information about the defendant before the jury, that would cross the line and violate the defendant's right to confrontation. State v. McGee, 284 S.W.3d 690, 702 (Mo. App. E.D. 2009); see also State v. Nabors, 267 S.W.3d 789, 795 (Mo. App. E.D. 2008) (cautioning prosecutors against such "backdoor attempts" to put non-testifying confidential informants' statements before jury). Therefore, "out-of-court-statements that implicate the defendant in the crime are admissible only to the extent they are necessary to explain the subsequent police conduct testified to at trial." McGee, 284 S.W.3d at 702.

In this case, the anonymous tips clearly implicated Boykins in the crime, but did not clearly explain the detective's subsequent conduct as testified to at trial. Detective Kaiser was asked only generally about what caused police to "focus their investigation" on Boykins, but there was no testimony as to what steps that "focus" entailed, what he or other officers actually *did* as a result of learning identifying information about the shooter from the anonymous callers. Rather, the questions and resulting testimony was all very general: the investigation "focused" on Boykins, it "progressed" and only after talking to Williams and Jones and conducting the "rest of the investigation" did the police take Boykins into custody. In many cases, a police investigation might not make sense to the jury without some explanation of how the investigation progressed from one phase to the next. For instance, the police may need to explain how they ended up at a particular address to find and arrest a defendant or search those premises. In those cases, the lack of background information creates a risk that the jury might fill in any gaps in the story with speculation. Brooks, 618 S.W.2d at 25.

But here there was no need for any such background information to maintain continuity in the detective's explanation of his investigation. Even without those anonymous tips, there would have been no "gaps" in the story and no attending risk of those gaps being filled in with damaging speculative information. The detective could have simply testified that they investigated the scene, did not initially find any witnesses who would identify the shooter and

5

then two days later two witnesses came forward and identified Boykins as the shooter. It was upon *this* information that the police proceeded to take Boykins into custody. Moreover, the anonymous tips did not lead to the interviews of Williams and Jones—Williams came to the police on his own, and the detective called Jones for a second interview after reviewing a surveillance tape. Thus, that "subsequent conduct" by the detective did not occur as a result of the tips, nor did those tips further provide any context, explanation or background for that conduct. Nor was there anything elicited at trial that would have shown that the anonymous tips led the police to do anything else in particular. Rather, they simply continued to receive more information similar to the information gleaned from the tips.

Even if the tips had been necessary to provide background or context to the investigation, they could have been mentioned without reference to the actual statements identifying Boykins. That is—as our courts have pointed out before—it would have been "more than sufficient" for the State to provide the jury with context by having the detective testify that the investigation initially focused on Boykins "upon information received" from anonymous tipsters. See State v. Garrett, 139 S.W.3d 577, 582 (Mo. App. S.D. 2004). That would have eliminated the hearsay problem altogether. But as it was, the statements made by the anonymous callers implicated Boykins in the crime directly and because they were not necessary to explain the investigation, they can only be seen as inadmissible hearsay in violation of Boykins rights under the Confrontation Clause.

Although prejudice may be presumed when constitutional rights are violated, reversal is not required if we determine the error was harmless beyond a reasonable doubt. Nabors, 267 S.W.3d at 795. That determination requires us to consider whether the error in admission was outcome-determinative. See State v. Barriner, 34 S.W.3d 139, 150 (Mo. banc 2000). Error in admitting evidence is not prejudicial and does not require reversal unless "the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of

6

the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." Id. We are convinced that this evidence was harmless and was not outcome-determinative.

This is not a situation in which the out-of-court statements provided the *only* evidence identifying Boykins as the shooter. Here, Jones's eyewitness testimony directly implicated Boykins as the shooter, and the other circumstances he testified about, along with Williams's testimony about what he saw after he heard the gunshots, corroborated Jones's testimony. Thus, this case is distinguishable from those cited by Boykins for the proposition that prejudice has been established merely by the incriminating nature of the statements. In those cases, there was little to no other strong evidence establishing guilt. See State v. Kirkland, 471 S.W.2d 191, 193 (Mo. 1971) (no other person identified defendant at trial except via hearsay statements); State v. Shigemura, 680 S.W.2d 256, 257 (Mo. App. E.D. 1984) (other evidence of defendant's knowledge that items in possession were stolen was weak, thus, hearsay statement by confidential informant that defendant was in possession of stolen property he intended to sell was prejudicial).

We also see no indication in the record that the jury relied on these anonymous tips as proof of guilt. Boykins points to the jury's request during deliberation to see a transcript of Jones's testimony. But this question merely demonstrates that the jury was focused on the key witness's testimony. It does not suggest that they were influenced by the anonymous tipsters' statements. But see State v. Robinson, 111 S.W.3d 510, 514 (Mo. App. S.D. 2003) (prejudice established by jury question to court during deliberation "what did the informant say?" because indicated some focus on and influence of out-of-court statement). Moreover, contrary to Boykins's claim, the State did not argue that the anonymous tips established Boykins's guilt. Rather, the State only briefly mentioned in closing argument that the investigation also included anonymous tips pointing towards Boykins. The State's central argument was that Jones's and

Williams's testimony supplied the evidence needed to meet its burden of proof. The only other reference to the tips was in rebuttal to the defense's suggestion that Jones and Williams came forward based on "gossip and rumors." The State merely pointed out in response that the defense had given no good reason why Jones or Williams would lie—whether based on gossip, anonymous tips or otherwise.

In the face of the other properly admitted testimony in this case—and with no indication that jury relied on the tips as proof of guilt anyway—it is not reasonable to believe that the jury would have reached a different result had the improperly admitted out-of-court statements of the anonymous tipsters been excluded.

Point denied. The judgment is affirmed.

ROBERT G. DOWD, JR., Presiding Judge

Mary K. Hoff, J. and
Roy L. Richter, J., concur.

8