**STATE of Missouri,
Plaintiff/Respondent,**

v.

**Kurtis WATKINS, Defendant/Appellant.**

**No. ED 104313**

Missouri Court of Appeals,
Eastern District,
DIVISION TWO.

Filed: August 29, 2017

FOR APPELLANT: Matthew W. Huckeby, 1010 Market Street, Suite 1100, St. Louis, Missouri 63101.

FOR RESPONDENT: Nathan J. Aquino, PO Box 899, Jefferson City, Missouri 65102.

Philip M. Hess, Judge

## Introduction

Kurtis Watkins ("Defendant") appeals the judgment of the Circuit Court of the City of St. Louis, following a jury trial, convicting him of unlawful possession of a firearm, unlawful use of a weapon, resisting arrest, three counts of first-degree assault, and three counts of armed criminal action. Defendant argues that the trial court abused its discretion in 1) denying his motion to suppress identification testimony from a police officer, 2) permitting the State to cross-examine him about his prior convictions after the nature of those offenses had already been established on direct examination, and 3) overruling his objection to hearsay statements by police officers that had been admitted under the "subsequent officer conduct" exception. Finding no error, we affirm.

## Factual Background

The evidence, viewed in a light most favorable to the jury's verdict,[1] is as follows.

### Witness Testimony [2]

In the evening of August 9, 2013, Mack Briscoe attended a house party on Louisiana Avenue, in the City of St. Louis. During the party, two attendees got into a heated argument. Mr. Briscoe involved himself in the altercation, which turned physical. Mr. Briscoe left the party, but returned later in the evening. When he

---

1. *State v. Wahl*, 89 S.W.3d 513, 515 (Mo. App. E.D. 2002).

2. Summary of witness testimony of Darryl Macon, Darrel Macon, and Mack Briscoe.

returned, he became involved in a fight between Stephant Hibler and Darrell Macon. Darrell is Mr. Briscoe's brother. Mr. Hibler had a gun, and threatened to shoot Darrell in the head. As the altercation continued, two police officers drove by and broke up the fight. Darrell and Mr. Briscoe then left the party and went to their mother's apartment, which was a few houses down the street on Louisiana Avenue. Their brother, Darryl Macon,[3] was also at their mother's apartment.

While they were on the porch at their mother's apartment, a young woman ran past them and warned that "they" were about to shoot. Gunfire then erupted from the other side of Louisiana Avenue, and the brothers saw Mr. Hibler shooting at them. The brothers also observed at least one other individual shooting across the street, but they did not recognize the individual. Darryl returned fire. During the shootout, Darrell was shot twice in the spine. He was seriously injured, but survived.

### Police Officer Testimony [4]

Officer Steven Pinkerton was patrolling the Dutchtown neighborhood of St. Louis late in the evening on August 9, 2013. During his patrol, Officer Pinkerton observed a large group of people engaged in a heated argument on Louisiana Avenue. Members of the group were yelling and threatening each other. Officer Pinkerton and another police officer broke up the crowd after informing them they would have to arrest them if they did not disperse. Although the crowd dispersed, Officer Pinkerton sensed that that the group would reform and continue fighting once he left. Officer Pinkerton decided to discretely monitor the situation. He hid behind a dumpster in a nearby alley to observe an area around an apartment building where half the crowd had regathered. Over his police radio, Officer Pinkerton informed his colleagues of his location and plan.

While behind the dumpster, Officer Pinkerton heard someone running on the street from his left to his right. He heard a gun rack, and then someone say, "mama get in the house, mama get in the house." He then heard an "ungodly" number of shots fired from his left on the street.

Officer Pinkerton heard footsteps and then observed two people firing guns from the mouth of the alley he was in. As the firing continued, Officer Pinkerton radioed in a description of one individual, stating that it was a black male with a black shirt and blue jeans. Officer Pinkerton could not see either man's face.

Officer Pinkerton lost sight of both men, although he continued hearing shots being fired. A man then came running down the alley toward Officer Pinkerton, who was still behind the dumpster. Officer Pinkerton could see a gun in the man's hand. Officer Pinkerton then emerged from behind the dumpster, and ordered the man to stop. The man looked at Officer Pinkerton and continued running in his direction. Officer Pinkerton observed the man's face for two or three seconds. As he ran by, the man appeared to raise his gun. Officer Pinkerton, afraid that the man would shoot, fired five shots at the man. At some point the man dropped his gun as he ran by. Officer Pinkerton thought at least one of his shots hit the man, as he seemed to stagger. However, the man continued running, and Officer Pinkerton was about to

---

**3.** Because Darrell Macon and Darryl Macon are brothers, we use their first names to avoid confusion. We intend no disrespect.

**4.** Summary of witness testimony of Officers Steven Pinkerton, Daniel Cora, and Joseph Rodriguez.

pursue him when a car came speeding down the alley. Officer Pinkerton went behind the dumpster again as the car went by. He then radioed a description of the man he observed in the alley, which he described as a balding, 6'2', 180 pound black male wearing jeans and a t-shirt.

Officers Daniel Cora and Joseph Rodriguez responded to Officer Pinkerton's radio call. While responding to the call, Officer Cora observed a six-foot-tall black man wearing dark clothing running in a gangway near the alley Officer Pinkerton had been hiding in. Officer Cora chased the man through an alley but lost him, and could not observe his face. Officer Rodriguez, who was nearby, then saw a man, later identified as Defendant, come running out of the gangway. Officer Rodriguez attempted to detain Defendant, who flailed and kicked. In response to Defendant's attempts to resist arrest, Officer Rodriguez punched Defendant multiple times. Officer Cora met up with Officer Rodriguez, and stated that the person he chased in the alley matched Defendant's physical characteristics.

Within fifteen minutes of arresting Defendant, police officers placed Defendant in a van and took him to Officer Pinkerton, who was still near the scene of the shooting. Officer Pinkerton identified Defendant as the person he shot at in the alley.

### Post-Arrest

Following his arrest, Defendant was charged with nine counts: Count I first-degree assault (class A felony), Count II armed criminal action, Count III first-degree assault (class B felony); Count IV armed criminal action, Count V first-degree assault (class B), Count VI armed criminal action; Count VII unlawful possession of a firearm; Count VIII unlawful use of a weapon; and Count IX resisting arrest. Defendant was charged as a prior felony offender.

Prior to trial, Defendant filed a motion in limine to suppress Officer Pinkerton's in-court identification of Defendant. A hearing was held on Defendant's motion, during which Officer Pinkerton testified that the alley he had been in had "good light" from lamps in the alley and a nearby street light. He identified the man who he saw run down the alley as Defendant. He testified that when Defendant came running down the alley at him, he "couldn't really tell at that point" whether he was the same person who had been firing shots from the mouth of the alley. Officer Pinkerton testified that he observed Defendant's face for "three or five" seconds as he ran by. Officer Pinkerton testified that he thought he shot four times at the Defendant but that investigators told him he actually fired five times. Officer Pinkerton testified that he thought at least one of his shots hit Defendant because it looked like Defendant stumbled and began "losing his power" after Officer Pinkerton shot at him. Officer Pinkerton testified that he radioed in a description of the man he encountered in the alley as a black male, about 6'2', 180 pounds, wearing jeans, a tee shirt, and "bald or balding short hair." Officer Pinkerton testified that within ten to fifteen minutes, he observed Defendant in a police van and identified him as the man he fired shots at. Officer Pinkerton testified he was 100% sure that it was the same individual.

On cross-examination, Officer Pinkerton testified that he could not be certain whether Defendant was the person he observed firing a gun from the mouth of the alley, but that Defendant had the same height, weight and clothing as the person shooting. He testified that he had his gun drawn and aimed at Defendant while he was running by him in the alley. Officer Pinkerton testified that his training would

have taught him to aim at Defendant's center mass. He testified that he "probably" had only two or three seconds to see Defendant's face while he was in the alley. He testified that although he fired five times, investigators only recovered four bullets. When asked what his emotional state was while he was firing at Defendant, he testified that he "wasn't shocked" but that being in a gunfight was "slightly" stressful. When asked whether he could remember any distinctive facial features of the suspect in the alley, Officer Pinkerton responded, "Just that he was balding." He could not remember if the suspect had facial hair. Officer Pinkerton further testified that when police officers brought Defendant to him in order to identify him, he was handcuffed in the back of a police van. He testified that he observed no bruises or signs of injury on defendant. The trial court denied Defendant's motion to suppress.

Defendant's first trial resulted in a hung jury. Defendant's second trial was held in April 2016. This time, the jury found Movant guilty on all counts, and he was sentenced to a total of twenty-five years' imprisonment. This appeal follows.

## Standard of Review

■ Defendant's three points on appeal are directed at the trial court's rulings on evidentiary matters. The trial court has broad discretion when making evidentiary rulings, which will not be disturbed on appeal absent an abuse of discretion. *State v. Williams*, 277 S.W.3d 848, 852 (Mo. App. E.D. 2009). The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration. *Id.* In matters involving the admission of evidence, we review for prejudice, not mere error, and will

reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. Morton*, 238 S.W.3d 732, 736 (Mo. App. E.D. 2007).

## Discussion

### I. *Officer Pinkerton's Identification*

■ In Defendant's first point, he argues the trial court erred in denying his motion to suppress Officer Pinkerton's identification of Defendant as one of the shooters. Defendant argues that Officer Pinkerton's initial identification of Defendant in the back of the police van was impermissibly suggestive because, among other things, he was the only individual presented as a potential suspect for identification. Defendant asserts the identification procedure used by the police, commonly called a "show-up," so tainted Officer Pinkerton's pre-trial and in-court identifications that the identifications were unreliable and should not have been allowed. The State contends that the show-up procedure used was permitted by Missouri case law. The State further argues that Officer Pinkerton's identification had high reliability.

■ We review the trial court's decision to admit identification testimony into evidence using a two-pronged test. *State v. Murray*, 428 S.W.3d 705, 709 (Mo. App. E.D. 2014). The first prong requires that we determine whether the identification procedure used by the police was impermissibly suggestive. *Id.* at 710. Police procedures are impermissibly suggestive when a witness's identification of the defendant is made in response to the suggestions or encouragement of police, instead of the witness's own observation and recollection. *Id.* If we determine the procedure was impermissibly suggestive, we then move to the second prong and assess the reliability of the witness's identification.

*Id.* We do not review for reliability unless the defendant proves the first prong. *Id.*

"Missouri courts have routinely held that show-ups are acceptable if properly administered." *State v. Moorehead,* 438 S.W.3d 515, 520 (Mo. App. E.D. 2014). A show-up is impermissibly suggestive only if the police unduly pressure the witness to make a positive identification. *Id.* "It is not impermissibly suggestive for police to present a single suspect for identification shortly after the crime occurred, in or near a police vehicle, even when the suspect is in handcuffs, particularly when the police make no overt remarks concerning the subject's identity." *Id.* Missouri courts have held that show-ups are "justified by the exigencies of the situation; such action may immediately indicate to the officers whether the suspect should be released or held, or whether they should continue the search." *State v. Hilliard,* ED 102889, — S.W.3d —, —, 2016 WL 1086507, at *3 (Mo. App. E.D. Mar. 15, 2016) (application for transfer to the Missouri Supreme Court denied on April 26, 2016).

Here, Defendant argues that Officer Pinkerton's fellow officers pressured him to make a positive identification during the show-up with Defendant. Defendant points out that when Officer Pinkerton made the identification, he was surrounded by police officers and Officer Pinkerton's supervisor. Defendant argues that "Officer Pinkerton was required to identify a suspect" and that "Officer Pinkerton was under what many would consider tremendous pressure to positively identify a man that his colleagues caught and fought, all in front of

his direct supervisor." However, Defendant does not cite to any Missouri case law which supports his argument that the show-up procedure was impermissibly suggestive.[5]

The State argues that the circumstances here are analogous to those in *State v. Eoff,* 193 S.W.3d 366 (Mo. App. S.D. 2006). In *Eoff,* the defendant and his accomplice robbed and beat a convenience store employee while concealing their faces with pantyhose. *Id.* at 369. Five hours after the assault and robbery, police asked the employee to come to the city hall to see if she could identify two suspects the police had recently apprehended. *Id.* at 370. The employee observed the attackers, who were each handcuffed and accompanied by police officers, and identified them as her assailants. *Id.* On appeal, the defendant challenged employee's pre-trial identification, arguing that it was unduly suggestive. *Id.* at 375.

The Southern District held that the fact that the witness viewed the defendant handcuffed and in the presence of a police officer, and that police called the defendant a "suspect," did not render the show-up impermissibly suggestive. *Id.* at 376. The Court held that "[s]ome intimation, implication or suggestion that officers suspect a subject presented to witnesses inevitably inheres in every show-up, else why conduct a show-up." *Id.* (internal quotation omitted). The Court noted that even though the defendant concealed his face with a pantyhose at the time of the robbery, the witness still observed the defendant's height, hair color, general build, and facial hair. *Id.* at 377. The witness stated she had no doubt the defendant was her assailant, and

---

5. We note that in his brief, Defendant incorrectly argues that in *Pargo v. State,* 198 S.W.3d 685 (Mo. App. S.D. 2006) the Southern District held that "a road side 'show-up' as 'not an ideal identification procedure.'" The portion of the *Pargo* opinion which De-

fendant cites to in his brief was part of a block quotation of the trial court's findings in that case. *Id.* at 690. Moreover, the Southern District affirmed the trial court's determination that the show-up did not unduly taint the witness's in-court identification. *Id.* at 690-91.

she felt no pressure from police to make the identification. *Id.* The Court held the show-up procedure used to identify the defendant was not unduly suggestive. *Id.*

Here, like the suspect in *Eoff*, Defendant was shown to Officer Pinkerton handcuffed and accompanied by police officers. Defendant argues that Officer Pinkerton felt pressured to identify Defendant as the shooter he encountered in the alley because his fellow police officers beat Defendant during his arrest. However, during the evidentiary hearing, Officer Pinkerton denied knowing the details of Defendant's arrest prior to identifying him. He also denied observing any signs of physical injury on Defendant when he identified him. During the trial, when asked whether he felt pressure to make a positive identification, he responded, "Absolutely not." There was no further evidence at the pre-trial evidentiary hearing or at trial which demonstrated Officer Pinkerton was pressured by his fellow officers to identify Defendant as the shooter he encountered in the alley. Ultimately, the show-up procedure used here was similar to that in *Eoff*, and like the witness in *Eoff*, Officer Pinkerton testified that he was not pressured to make an identification. Considering the case law in Missouri regarding the permissibility of show-up procedures, and the testimony of Officer Pinkerton, we conclude that the show-up procedure used here was not impermissibly suggestive.

 Because the show-up procedure was not impermissibly suggestive, we need not consider whether Officer Pinkerton's identifications were reliable. *Murray*, 428 S.W.3d at 710. The factors relating to the reliability [6] of Officer Pinkerton's identifi-cation of Defendant went to the weight, and not the admissibility, of his testimony. *Eoff*, 193 S.W.3d at 376. Defendant's trial counsel extensively cross-examined Officer Pinkerton on his ability to view Defendant in the alley, his certainty in his identification, discrepancies in his descriptions of Defendant, and any ulterior motives he might have for identifying Defendant as the suspect in the alley. It was for the jury to decide what weight to give Officer Pinkerton's testimony. Point I is denied.

## II. *Prior Convictions*

 Defendant asserts that the trial court abused its discretion when it allowed the State to cross-examine him about his prior convictions. Defendant argues that he had established the nature of his prior offenses during direct examination, and therefore the State's cross-examination on his prior offenses was cumulative and unfairly prejudicial. The State argues that Missouri statutory and case law permit the State to demonstrate a defendant's prior convictions on cross-examination.

During his direct examination, Defendant admitted that he pleaded guilty to: 1) unlawful use of a weapon, exhibiting, and resisting arrest in March 2009; 2) possession of less than 35 grams of marijuana in August 2009; 3) two counts of possession of cocaine with intent to distribute in April 2011; and 4) unlawful use of a weapon, exhibiting, and resisting arrest in June 2011. Defendant also testified regarding the length of his sentences and the locations of where he pleaded guilty.

During the State's cross-examination of Defendant, the State sought to question Defendant on his prior convictions. Defen-

---

**6.** Factors courts examine when determining reliability are: (1) the opportunity of the witness to view the criminal during the commission of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the witness's degree of certainty; and (5) the length of time between the crime and the confrontation. *State v. Naylor*, 505 S.W.3d 290, 296 (Mo. App. W.D. 2016).

dant objected, arguing that his convictions had been "covered in full on direct." However, the trial court overruled Defendant's objection. The State then asked essentially the same questions that Defendant had answered on direct examination. The State questioned Defendant on the types of crime he had been convicted of, the dates of his convictions, and the length of his sentences.

Section 491.050 [7] permits the State to cross-examine a defendant who testifies. It reads, in relevant part:

> "[A]ny prior criminal convictions may be proved to affect [a defendant's] credibility ... Such proof may be either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer."

In interpreting § 491.050, this Court has held that the State has an "absolute right" to demonstrate the nature of a defendant's prior convictions. *State v. Tramble*, 383 S.W.3d 34, 40 (Mo. App. E.D. 2012). The only limit on the State's "absolute right" is that it may not go into the details of the crimes leading to the prior convictions. *Id.*

Defendant cites to *State v. Aye*, 927 S.W.2d 951 (Mo. App. E.D. 1996) and *State v. Phelps*, 677 S.W.2d 418 (Mo. App. E.D. 1984) to support his argument it was impermissible for the State to cross-examine him regarding his prior convictions after he already established his prior convictions on direct.

In *Aye*, the defendant admitted on direct examination he had two prior convictions for possession of cocaine, and he testified to the nature, date, place, and sentences he received. 927 S.W.2d at 953. On cross-examination, the State inquired into details of the defendant's previous trial. *Id.* at

953-54. Over the defendant's objection, the State asked him questions regarding what his defense had been at his previous trial, and asked numerous questions about his knowledge and possession of drugs in his previous cases. *Id.* On appeal, we determined that the trial court abused its discretion in overruling the defendant's objections during his cross-examination. *Id.* at 957. We held that "[the defendant's] admission of his prior convictions accomplished the purpose of impeaching his credibility. Further cross-examination regarding these matters should not have been permitted." *Id.* at 955.

In *Phelps*, the defendant admitted on direct examination he had a prior conviction for second-degree robbery and armed criminal action. 677 S.W.2d at 419. On cross-examination, and over the defendant's objection, the State questioned him extensively about his level of intoxication during the commission of his previous crime, and about the gun he had used. *Id.* at 419-20. For example, the State asked, "Did you have the gun before or after you drank the fifth of whiskey?" *Id.* at 420. On appeal, we determined that the trial court abused its discretion in overruling the defendant's objection during cross-examination. *Id.* at 422. We held that "[t]he defendant admitted the prior conviction and the resultant probation. The purpose of impeaching his credibility by reference to the prior conviction was fully accomplished by this testimony. No further justification existed for inquiry into the details of the prior crime." *Id.* at 421.

Defendant contends that our holdings in *Aye* and *Phelps* prevent the State from inquiring into a defendant's criminal history if he has testified about the general nature of his convictions on direct examination. The State argues that Defendant

---

7. All references to statutes are to RSMo 2000.

takes our holdings in *Aye* and *Phelps* out of context. In those cases, the State argues, we reversed because the trial courts allowed the State to delve into specific details of the defendants' prior crimes. The State argues our holdings do not preclude the cross-examination of a defendant about his prior convictions, regardless of whether he has admitted them on direct examination, as long as the State does not delve too deeply into the details of the prior convictions.

We agree with the State. We reversed the trial courts in *Aye* and *Phelps* because the State's cross-examination of the defendants' prior convictions went well beyond the "nature, date, and place of each prior crime and the resulting sentence" and there was no justification for such inquiries. *See Aye*, 927 S.W.2d at 955 (summarizing our holding in *Phelps*). We did not hold that the State is automatically barred from cross-examining a defendant on his prior convictions once the defendant admits his convictions on direct examination.

Our determination is supported by our holdings in *State v. Tramble*, 383 S.W.3d 34 (Mo. App. E.D. 2012) and *State v. Frison*, 775 S.W.2d 314 (Mo. App. E.D. 1989). In *Tramble*, we held there was no plain error where the State was allowed to cross-examine the defendant regarding sentences he served for prior convictions, even though the defendant had already testified on direct examination regarding his sentences. *Id.* at 40. We noted that the State has an absolute right to demonstrate a defendant's prior convictions on cross-examination. *Id.*

In *Frison*, the defendant testified on direct examination to the nature and number of his prior convictions and the sentences he received. 775 S.W.2d at 318. His testimony included statements that he pleaded guilty three times to possession of marijuana. *Id.* Despite the defendant's admission, the State asked the defendant during cross-examination if he pleaded guilty to each of his prior convictions. *Id.* The State also referenced the defendant's prior convictions and time served during closing argument. *Id.* On appeal, this Court held that the trial court did not abuse its discretion in allowing the State to demonstrate the defendant's prior convictions. *Id.* We noted that the extent of cross-examination of an accused rests within the discretion of the trial court, and the State did not improperly ask the defendant "questions regarding details of the crimes leading to his prior convictions." *Id.*

Here, the State's cross-examination went to the nature, date, place and resulting sentence of Defendant's prior crimes. The most "detailed" question the State asked Defendant was whether "unlawful use of a weapon, exhibiting" meant that "you pointed a gun at someone." This question went to the general nature of his prior crime, and merely explained to the jury what unlawful use of a weapon, exhibiting, meant. Although the trial court would have been within its discretion to further limit the State's line of questioning regarding Defendant's prior convictions, the trial court did not abuse its discretion in allowing it. Point II is denied.

### III. *Subsequent Officer Conduct*

In his third point, Defendant argues that the trial court abused its discretion in overruling his objection to the admission of several hearsay statements made by Officers Rodriguez and Cora. The State contends that it offered the testimony to explain the Officers' subsequent conduct, and was admitted solely for that reason. The State also argues that Defendant cannot

demonstrate prejudice.[8]

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *State v. Taylor*, 373 S.W.3d 513, 520 (Mo. App. E.D. 2012). Out-of-court statements that are not offered to prove the truth of the matter asserted – but rather to explain subsequent police conduct – are not hearsay. *State v. Boykins*, 477 S.W.3d 109, 112 (Mo. App. E.D. 2015). Furthermore, "if a statement is not offered to prove the truth of the matter asserted, then the defendant's right to confront the witnesses against him is not implicated." *Id.*

Using out-of-court statements to explain subsequent police conduct is susceptible to abuse. *Id.* Therefore, "out-of-court-statements that implicate the defendant in the crime are admissible only to the extent they are necessary to explain the subsequent police conduct testified to at trial." *Id.*

During trial, Defendant objected to out-of-court statements testified to by Officers Cora and Rodriguez. The statements were made during the Officers' testimony regarding their pursuit of a suspect through the alleys and gangways near Louisiana Avenue. The challenged testimony, in context, is below:

*i. Officer Cora's Testimony*

[Officer Cora]: ... There was a marked patrol vehicle that was traveling west on Keokuk.

[Prosecutor]: Towards Arkansas?

[Officer Cora]: Towards Arkansas.

[Prosecutor]: And did you—were you able to give that officer in that vehicle any information?

[Officer Cora]: Yes, I advised him—

[Defense Counsel]: Object to hearsay, Judge.

[Trial Court]: Your response.

[Prosecutor]: Subsequent officer conduct. They are all communicating with observations they made.

[Trial Court]: Be admitted for that purpose only. You can answer.

[Officer Cora]: Advised the other officers that the suspect was last seen running north in the alley of 3451 Keokuk.

*ii. Officer Rodriguez's Testimony*

[Officer Rodriguez]: When we responded, we went to the area of Arkansas and Dunnica. We weren't exactly sure what was going on because we were kind of the latter portion getting there ... we heard them wanting to basically set up a perimeter which we did....

[Prosecutor]: As you are responding and that perimeter is being established, do you hear any officers report whether or not they think they see a suspect?

[Officer Rodriguez]: Yeah. South of our location where we were set up there was an officer ... I don't know who it was, saying—

[Defense Counsel]: Objection to hearsay, Judge.

[Trial Court]: Your response?

[Prosecutor]: Subsequent officer conduct.

[Trial Court]: Admitted for those purposes. Overruled.

[Officer Rodriguez]: Over the radio we are hearing there was a subject matching the description running northbound through some gangways.

---

**8.** The State asserts that we should review Defendant's Point III for plain error because the Defendant failed to preserve his argument for appeal. We disagree with the State because the record demonstrates that Defendant's argument was raised in his motion for new trial, and he properly included his arguments in his points relied on.

Officer Rodriguez later testified that he heard another police officer screaming in the alley between Chippewa and Dunnica. Defendant objected to this testimony as hearsay, but the trial court again overruled his objection "for the same reason."

### iii. Closing Argument

Defendant also objected when, during closing argument, the prosecutor said, "[Officer Rodriguez and his partner] hear another officer in the backyard of Dunnica yell, he is running south.... That's what he hears. [Officer Rodriguez] gets of his car and he sees [Defendant] run out of this gangway and [Defendant] continues to try to get away...." The trial court overruled Defendant's objection.

### iv. Analysis

None of the out-of-court statements which Defendant complains of were hearsay. We disagree with Defendant's argument that the prosecutor relied on the hearsay statements to "track" the Defendant's location. The prosecutor was limited by the trial court to using the out-of-court statements to supply relevant background and continuity, and explain why police officers took certain actions. *See State v. Dunn*, 817 S.W.2d 241, 243 (Mo. 1991) ("statements made by out-of-court declarants that explain subsequent police conduct are admissible, supplying relevant background and continuity."); *see also State v. Coram*, 231 S.W.3d 865, 869 (Mo. App. S.D. 2007) (explaining that out-of-court statements were not hearsay because they were not admitted for the truth of the matter asserted "but to show how and when the witnesses became involved as the events unfolded"). The prosecutor never used the challenged statements for the truth of the matter asserted (*i.e.*, that Defendant was at a specific location at a specific time). The trial court did not err in admitting the challenged out-of-court statements or in overruling Defendant's objection to the prosecutor's reference to the statements in closing argument.

Even if the statements were not properly admitted, the level of prejudice Defendant suffered would not have warranted a reversal. There was other evidence demonstrating that Defendant was the same person Officer Pinkerton saw running through the alley. Officer Pinkerton testified as much. Officers Cora and Rodriguez testified they observed Defendant breathing heavily and sweating profusely when he was captured, which is consistent with someone who had been running. Furthermore, Defendant was caught by police officers near the scene of the shooting, and he attempted to flee when police officers arrested him.

We deny Movant's third point.

### Conclusion

The judgment of the trial court is affirmed.

Lisa P. Page, P.J. and Roy L. Richter, J. concur.

