

# In the Missouri Court of Appeals
# Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | ED111111 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | Case No. 2022-CR01706 |
| | ) | |
| TERAZ BATEMAN, | ) | Honorable Madeline O. Connolly |
| | ) | |
| Appellant. | ) | Filed:  October 31, 2023 |

Teraz Bateman (Bateman) appeals from the trial court's entry of judgment and sentence after a jury found him guilty of one count of felony murder in the second degree, one count of robbery in the first degree, and two counts of armed criminal action (ACA). He challenges the sufficiency of the evidence supporting his convictions for felony murder and first-degree robbery, the trial court's admission of statements he made during his police interview, the trial court's admission of a pre-trial identification, and whether his trial counsel provided ineffective assistance of counsel.  We affirm.

### Background

The State charged Bateman as a prior and persistent offender with one count of the class A felony of murder in the second degree, one count of the class A felony of robbery in the first degree, and two associated counts of ACA, stemming from an incident in August 2019 when Bateman and two co-defendants, acting together, killed Victim by shooting him

during the perpetration of a robbery, in which Bateman was armed with a deadly weapon. Before trial, Bateman moved to suppress both the statements Bateman made during his interview with the police and the out-of-court identification by Victim's sister (Sister). The trial court denied his motions to suppress after a hearing.

The State introduced the following facts at trial, as relevant to the issues on appeal. On the day before the shooting, a co-defendant (Accomplice 1) met with Sister's boyfriend (Buyer) and sold him marijuana. On the morning of August 9, 2019, Buyer and Accomplice 1 arranged for a second sale of half a pound marijuana for $2,200 to take place that afternoon. Accomplice 1 then exchanged text messages with Bateman regarding a "lick"—which the St. Louis County Police Department Lead Homicide Detective (Lead Detective) testified is a common term for robbery—they were planning for that afternoon.

Buyer arrived for the purported drug deal bringing with him Sister and Victim, who was armed with a 9-millimeter pistol. Accomplice 1 arrived for the purported drug deal bringing with him Bateman and a second co-defendant (Accomplice 2), all of whom were armed with, respectively, a 9-millimeter pistol (Accomplice 1), a .40 caliber pistol (Bateman), and an AK-styled assault rifle (Accomplice 2). Both Accomplice 1 and Bateman entered the back seat of Buyer's car on either side of Victim, and Accomplice 1 demanded the money. Buyer and Sister both testified Accomplice 1 did not produce the agreed-upon marijuana. Although surveillance video from a nearby restaurant showed that Accomplice 1 was carrying a bag when he entered Victim's vehicle, when police later searched the bag, they discovered it contained a rolled-up blanket and not half a pound of marijuana. Sister testified that she realized they were being robbed and she gave the money to Accomplice 1 in the hopes he and Bateman would leave the car. However, Accomplice

2

2 then approached the car and shot Victim through the window. Victim died as a result of eight gunshot wounds. Shell casings from the .40 caliber pistol Bateman was carrying were found at the scene, and three of Victim's wounds were from bullets that had entered from his right side where only Bateman was sitting.

Buyer and Sister both identified Accomplice 1 from a photo lineup as one of the people who robbed them and shot Victim. Sister also looked at a photo lineup for Bateman, but she identified someone from the lineup other than Bateman as a participant in the robbery and shooting. Later that night, however, as she was looking at Accomplice 1's Facebook page, she recognized Bateman in Accomplice 1's Facebook pictures by Bateman's distinctive face tattoo of a gun and realized her mistake in her earlier identification. She contacted the police regarding her misidentification and sent the police photographs from Facebook of both Bateman and Accomplice 2, identifying them as participants in the robbery and murder, and of the car they had been driving. She reported that, in one of the photographs, Bateman was holding the AK-styled assault rifle used in the robbery and shooting, and, in another photograph, he was holding Victim's gun. The police set up an in-person lineup, and Sister and Buyer both identified Bateman in the in-person lineup as one of the participants in the robbery and shooting. At trial, Sister explained that in the photo lineup of Bateman, she could not see Bateman's face tattoos, but that, when she viewed him in the in-person lineup, she was able to see his whole face.

After police arrested Bateman and the Lead Detective read him his Miranda[1] rights, Bateman initially invoked his right to an attorney. However, after he learned of the charges against him, Bateman asked to speak with the Lead Detective. The Lead Detective

---

[1] Miranda v. Arizona, 384 U.S. 436, 478 (1966).

informed Bateman she could not talk to him unless he waived his right to an attorney. Bateman specifically stated he was waiving his right to an attorney and he was re-read his Miranda rights. Bateman then admitted to the Lead Detective that he had been present at the alleged robbery and shooting, although he characterized the incident as a drug deal gone bad; that during the drug deal he was carrying a .40 caliber pistol, Accomplice 1 was carrying a 9-millimeter pistol, and Accomplice 2 was carrying an AK-styled assault rifle; and that Accomplice 1 took Victim's 9-millimeter pistol.

At the conclusion of evidence at trial, Bateman moved for an acquittal on the grounds that the evidence was insufficient to sustain a conviction, and the trial court denied the motion. The jury found Bateman guilty on all charges. In a post-trial motion for a new trial, Bateman again challenged the admission of both his statements and of Sister's identification, which the trial court denied. The trial court sentenced Bateman as a prior and persistent offender to a term of life in the Missouri Department of Corrections on the felony murder count, and to concurrent terms of ten years each for the remaining three counts of robbery first and ACA. This appeal follows.

## Discussion

### Points I and IV

In his first and fourth points on appeal, Bateman argues the trial court erred in denying his motion for acquittal at the end of trial and in entering judgment against him because the State's evidence was not sufficient to support his conviction for first-degree robbery (Point IV) and thus also his conviction for felony murder, which was predicated on the underlying felony conviction for first-degree robbery (Point I). We disagree.

4

We review challenges to the sufficiency of the evidence supporting a criminal conviction by determining whether the State presented sufficient evidence at trial from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt of all the essential elements of the crime. State v. Hosier, 454 S.W.3d 883, 898 (Mo. banc 2015). We do not reweigh the evidence but accept as true all evidence supporting the jury's verdict, including all favorable inferences therefrom, and disregard all contrary evidence and negative inferences. Id.

A person is guilty of second-degree felony murder if he or she commits or attempts to commit a felony and, in the perpetration or attempted perpetration of that felony, another person is killed as a result of the perpetration or attempted perpetration of that felony. Section 565.021.1(2). Felony murder in the second degree requires proof beyond a reasonable doubt both of the commission or attempted commission of any felony, and the death of any person as a result of the perpetration or attempted perpetration of such felony. State v. Hendricks, 619 S.W.3d 171, 186 (Mo. App. W.D. 2021).

Here, in order to convict Bateman of felony murder, the State had to prove he committed the underlying offense of first-degree robbery and that Victim died as a result of the perpetration of the robbery. See State v. Mason, 616 S.W.3d 345, 348 (Mo. App. E.D. 2020); State v. Burrage, 465 S.W.3d 77, 80 (Mo. App. E.D. 2015). Under Section 570.023, a person commits the offense of robbery in the first degree if he or she forcibly steals property and during the robbery he or she or another participant in the offense causes serious physical injury to any person or is armed with a deadly weapon. Section 570.023.1(1)-(2). Our review of the record here shows overwhelming evidence that

5

Bateman committed the underlying felony of first-degree robbery and that Victim died as a result of the robbery.

The State introduced evidence that Accomplice 1 and Bateman had exchanged text messages regarding a "lick"—which the Lead Detective testified is a common term for robbery—they were planning for the same afternoon that the purported drug deal was scheduled. At the purported drug deal, Bateman and Accomplice 1 both entered the back seat of Buyer's car on either side of Victim, and Accomplice 1 demanded the money but did not produce the agreed-upon marijuana. Moreover, the bag Accomplice 1 was carrying when he entered Buyer's vehicle contained a rolled-up blanket and not half a pound of marijuana. Sister testified that she understood it was a robbery and so gave the money to Accomplice 1; however, Accomplice 2 then approached the car and shot Victim through the window. Victim died as a result of eight gunshot wounds. Shell casing from the .40 caliber pistol Bateman was carrying were found at the scene, and three of Victim's wounds were from bullets that had entered from his right side where only Bateman was sitting.

Surveillance video showed that Bateman was present and that he shot his weapon, and both Buyer and Sister both identified Bateman in an in-person lineup and in court as a participant in the robbery and murder. Finally, when he was questioned by police, Bateman agreed he was present at the alleged robbery and shooting, although he characterized the incident as a drug deal gone bad. He did, however, agree that Accomplice 1 took Victim's 9-millimeter pistol.

On these facts, we find there was more than sufficient evidence from which a jury could find beyond a reasonable doubt that an armed robbery occurred, that Bateman was an active participant in the armed robbery, and that Victim died as a result of the

6

perpetration of the robbery.  See Hosier, 454 S.W.3d at 898; Mason, 616 S.W.3d at 348; Burrage, 465 S.W.3d at 80.

Bateman points to argument he offered that this was merely a "drug deal gone bad," as well as the fact that Victim was also carrying a gun, to argue that the evidence was insufficient to find him guilty of first-degree robbery, and accordingly, felony murder.  In so doing, Bateman essentially invites us to re-weigh the evidence, and we decline.  Our task is to determine only whether there was sufficient evidence from which the jury could find Bateman guilty of the charged crimes, and as we have discussed, we find there was. See Mason, 616 S.W.3d at 34 (we do not reweigh evidence on appeal but defer to jury's factual findings).  The trial court did not err in denying Bateman's motion for acquittal and in entering judgment against him on the charges on first-degree robbery and felony murder.

Points I and IV are denied.

## Point II

In his second point on appeal, Bateman argues the trial court erred in denying his motion to suppress and admitting the statements he made to the Lead Detective after invoking his right to counsel because the admission of these statements violated his Fifth Amendment rights to be free from self-incrimination and to counsel.  We disagree.

We will reverse a trial court's ruling on a motion to suppress only if it is clearly erroneous, which occurs when, after review of the entire record, we are left with the definite and firm impression the trial court has made a mistake.  State v. Lammers, 479 S.W.3d 624, 630 (Mo. banc 2016).  We defer to the trial court's findings of fact and credibility determinations, we view the evidence and all reasonable inferences therefrom in the light

most favorable to the trial court's ruling. Id. However, we review *de novo* whether conduct violates the Fifth Amendment because that is a question of law. Id.

Once an accused has expressed his desire for counsel, he may not be subject to any further interrogation until counsel has been made available to him, "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); see also State v. Bannister, 680 S.W.2d 141, 147-48 (Mo. banc 1984) ("[a] request for counsel bars further interrogation until an attorney is present, unless the accused in the interim voluntarily initiates discussion"). For the subsequent waiver of counsel to be valid, the defendant must be the one to initiate communication with police rather than merely responding to police-initiated custodial interrogation. Edwards, 451 U.S. at 484. A waiver of counsel must not only be voluntary, but the circumstances must indicate a knowing and intelligent relinquishment or abandonment of a known right or privilege. Id. at 482. When a defendant moves to suppress a statement as taken in violation of his or her Miranda rights, the State must prove by a preponderance of the evidence that the defendant properly waived his or her rights. State v. Powell, 798 S.W.2d 709, 713 (Mo. banc 1990).

Here, there is no debate that Bateman initially invoked his right to counsel, and the only question is whether he knowingly and intelligently relinquished this previously invoked right by initiating further communication with police. The video of Bateman's interrogation shows that after police first booked Bateman, the Lead Detective read Bateman his Miranda rights, Bateman invoked his right to an attorney, and the interview stopped. Several hours later, after Bateman participated in an in-person lineup, a different police officer asked Bateman to sign the charges against him. Bateman asked what the

8

charges were, and when he was informed he was being charged with murder, he asked to speak to the Lead Detective. When the Lead Detective arrived, Bateman asked why he was being charged with murder and wanted to know the evidence against him. The following exchange between Bateman and the Lead Detective then occurred:

> Lead Detective: Ok, you invoked your right to an attorney with me, so you, I- I can't, I am not legally allowed to talk to you, because you said you wanted an attorney. Now, if you want to waive your right to an attorney, I will sit down and we will talk about this. But if you're just on like a fact-finding mission to see, like, what I have on you, I'm not gonna do that. You'll find all that out when you- when you get an attorney assigned to you or you hire an attorney and they'll- they'll get the discovery from the prosecutors and that's the way that goes.

> Bateman: So how -

> Lead Detective: But if you want to explain your side of the story, then you can- you have to say that you don't want a lawyer present and that you want to sit and talk to me right now, and I'll come back in, I'll get my folder and my notebook and I'll come back in and sit down and talk to you. But you told me you didn't want to talk to me without a lawyer, and I'm not gonna violate your rights.

> Bateman: Can you bring me a cigarette here outta my pocket?

> Lead Detective: A cigarette?

> Bateman: Yeah.

> Lead Detective: What do you want a cigarette for?

> Bateman: Because I'm gonna tell you what happened.

> Lead Detective: You're gonna tell me what happened?

> Bateman: Yeah.

> Lead Detective: You wanna waive your right to an attorney and you wanna tell me what happened?

> Bateman: Yeah but I wanna let you know it was a drug deal gone bad, though.

9

Lead Detective: So you're -

Bateman: Yeah I'm waiving my rights.

Lead Detective: To an attorney?

Bateman: Yeah, (unintelligible) me a cigarette though?

Lead Detective: I'll promise you a cigarette after we talk. How about that? Cause I gotta take you outside to the garage.

Bateman: All right.

Lead Detective: So you're waiving your right to an attorney?

Bateman: Yeah.

Lead Detective: Let me get my notebook.

When the Lead Detective returned, she read Bateman his Miranda rights again, and Bateman affirmed he understood his rights and verbally waived those rights. Bateman then made a series of incriminating statements that were admitted at trial.

Bateman's repeated statements that he wanted to waive his right to counsel in order to talk to the Lead Detective, the Lead Detective's reissuance of the Miranda warning before questioning Bateman, and Bateman's statement that he understood the rights he was waiving are sufficient to demonstrate a valid waiver of his right to counsel. See Bannister, 680 S.W.2d at 148 (valid waiver when record showed defendant expressed desire to talk to officers, officers reissued Miranda warning, and defendant indicated he understood his rights and wished to talk). The record shows that law enforcement respected Bateman's right to have counsel present during his interrogation, and that Bateman was the one to initiate further discussions with the Lead Detective. Although Bateman did not request to speak with the Lead Detective until after he was read the charges against him, merely

10

informing Bateman of charges does not amount to a police-initiated custodial interrogation that would invalidate Bateman's waiver. See State v. Nichols, 504 S.W.3d 755, 760-61 (Mo. App. E.D. 2016) ("courts in Missouri and the Eighth Circuit have consistently held that mere informative statements about a defendant's charges and evidence against him are not the functional equivalent of interrogation"). Under the circumstances here, we find that Bateman initiated communication with the police, and that he knowingly and intelligently waived his right to counsel and voluntarily gave a statement. The trial court here did not err in denying Bateman's motion to suppress and admitting his statements made after a knowing and intelligent waiver of his right to counsel.

Point II is denied.

### Point III

In his third point on appeal, Bateman argues the trial court erred in denying his motion to suppress Sister's identification because the identification procedures were unnecessarily suggestive.[2] We disagree.

In general, it is within the discretion of trial courts to admit or exclude evidence, and we will review those decisions for an abuse of discretion. State v. Washington, 444 S.W.3d 532, 536 (Mo. App. E.D. 2014). Error in the admission or exclusion of evidence does not justify reversal unless the error was so prejudicial that it deprived the defendant of a fair trial, in that, but for the error, the result of the trial would have been different. Id. Following a trial court's ruling on a motion to suppress a witness' identification, we review for whether there was sufficient evidence in the record to support the ruling, and we will

---

[2] The State argues that Bateman's third point on appeal is vague and multifarious and thus preserves nothing for appeal, in that his Point Relied On argued the police procedures were unnecessarily suggestive and his argument section identified two suggestive police procedures. We find Bateman's point sufficiently complies with Missouri Rule of Appellate Procedure 84.04 (2022), and we address the merits.

11

affirm unless we find the ruling was clearly erroneous, viewing the facts and reasonable inferences therefrom in the light most favorable to the trial court's ruling, and disregarding all contrary evidence and inferences. State v. Robinson, 541 S.W.3d 21, 25 (Mo. App. E.D. 2018).

"Identification testimony is admissible unless the pretrial identification procedure was unnecessarily suggestive *and* the suggestive procedure made the identification unreliable." State v. Middleton, 995 S.W.2d 443, 453 (Mo. banc 1999). Courts employ a two-part test to determine whether identification evidence is admissible. State v. Ivy, 455 S.W.3d 13, 19 (Mo. App. E.D. 2014). We first determine whether the pre-trial identification procedure was unduly suggestive, which occurs if the identification is the result of the procedures used by the police rather than the result of the witness' recollection. Id. The challenged procedure must be a police procedure, and challenges to the admissibility of identification evidence cannot be based on non-police conduct. State v. Butler, 642 S.W.3d 364, 372 (Mo. App. E.D. 2022). If the police procedure is not suggestive, then the pre-trial and any in-court identifications are admissible. Ivy, 455 S.W.3d at 19. Only if the procedure is unduly suggestive must courts continue to the second part of the test to determine whether the suggestive procedures "so tainted the identification as to lead to a substantial likelihood that the pre-trial identification was not reliable." State v. Chambers, 234 S.W.3d 501, 513 (Mo. App. E.D. 2007).

Here, Sister identified someone other than Bateman in the initial photo lineup. However, after she left the police department, she looked up Accomplice 1's Facebook page where she saw photographs of Bateman and realized her mistake in her identification. She contacted detectives regarding her misidentification and sent them photographs of

12

Bateman from Accomplice 1's Facebook page, identifying Bateman as a participant in the robbery and murder. Police arrested Bateman and set up an in-person lineup, from which Sister and Buyer both identified Bateman as one of the participants in the robbery and shooting. The in-person lineup comprised four participants including Bateman, and its format was that each of the four participants walked into the viewing room individually for observation.

On appeal, Bateman first challenges that police allowed Sister to perform a second identification after withdrawing her first identification. However, it was Sister who contacted the police to withdraw her initial mistaken identification from the photo lineup, and not the reverse. No police officer told Sister she had identified the wrong person or instructed her on whom to correctly identify. Sister's actions in finding pictures on Facebook and withdrawing her initial identification are not police conduct and therefore cannot form the basis of a challenge to the admission of the pre-trial identification. See Butler, 642 S.W.3d at 372 (challenges to admissibility of identification evidence cannot be based on non-police conduct). Moreover, a second identification procedure in itself is not unduly suggestive without more evidence of suggestive police procedure. See, e.g., State v. Allen, 274 S.W.3d 514, 525 (Mo. App. W.D. 2008) ("an initial identification by photo followed by a lineup identification is not per se unduly suggestive").

Second, Bateman on appeal characterizes the in-person lineup as akin to a show-up identification because each participant was shown individually rather than lined up together in a row, which he asserts is a widely condemned practice. However, our review of the record demonstrates that Sister and Buyer did not view a show-up identification[3] but an in-

___

[3] Regardless, we note that "Missouri courts have routinely held that show-ups are acceptable if properly administered." State v. Watkins, 527 S.W.3d 204, 210 (Mo. App. E.D. 2017) (citation omitted).

13

person lineup with four participants. The in-person lineup was conducted by a blind administrator, who testified he did not know which of the four participants was the defendant. He took Sister and Buyer separately to the viewing room, where they viewed four participants, one at a time. The blind administrator testified he told Sister and Buyer they did not have to identify anyone from the lineup, he did not tell them that Bateman was among the participants, and he did not tell them whom to identify. Both Sister and Buyer identified Bateman. Bateman only challenged Sister's identification at trial. The record here does not show unduly suggestive police procedures in conducting the pre-trial identification, such that would affect the admissibility of the identification. See Ivy, 455 S.W.3d at 19.

Because we find that the in-person lineup was not impermissibly suggestive, we need not consider whether Sister's identification was reliable. Any factors relating to the reliability of her identification went to the weight, not the admissibility, of the identification testimony. State v. Watkins, 527 S.W.3d 204, 211 (Mo. App. E.D. 2017). Sister explained the basis for her initial misidentification (namely, that the photograph in the photo lineup did not show Bateman's distinctive face tattoo of a gun) and why she was sure of her identification of Bateman in the in-person lineup (namely, that she was able to see his whole face), and it was up to the jury to determine the weight of her testimony. See id. The trial court did not err in denying Bateman's motion to suppress the identification or in admitting the identification evidence.

Point III is denied.

### Point V

14

In his fifth and final point on appeal, Bateman argues his trial counsel was ineffective in that counsel did not allow Bateman to testify in his own defense. This Court may not consider claims for ineffective assistance on direct appeal.

Missouri Rule of Criminal Procedure 29.15 (2022) explicitly states that it is the "exclusive procedure" by which a person convicted of a felony after a trial may seek relief for claims of ineffective assistance of trial or appellate counsel. Rule 29.15(a); see also State v. Nettles, 481 S.W.3d 62, 68-69 (Mo. App. E.D. 2015) (claims for ineffective assistance of counsel are not cognizable on direct appeal, even if compelling). Bateman has not filed his claim for ineffective assistance pursuant to Rule 29.15, and this Court has no authority to consider it on direct appeal.

Point V is dismissed.

### Conclusion

The trial court's judgment of conviction and sentence is affirmed.

_____
Gary M. Gaertner, Jr., J.

Lisa P. Page, P.J., and
Angela T. Quigless, J., concur.